UNITED STATES, Appellee,

v.

Private First Class Michael L.
MEYERS, 336–62–5359, United
States Army, Appellant.

CM 446457.

U.S. Army Court of Military Review.

26 March 1986.

For Appellant: Captain Martin B. Healy, JAGC (argued); Lieutenant Colonel Arthur L. Hunt, JAGC, Major Stephen R. Dooley, JAGC, (on brief).

For Appellee: Captain Tarek Sawi, JAGC (argued); Lieutenant Colonel Gary F. Roberson, JAGC, Lieutenant Colonel Larry D. Williams, JAGC, Captain Laura G. Poston, JAGC (on brief).

Before RABY, CARMICHAEL and ROBBLEE, Appellate Military Judges.

## OPINION OF THE COURT

CARMICHAEL, Judge:

Contrary to his pleas, appellant was convicted by a military judge of two specifications of wrongfully distributing hashish and one specification of wrongfully possessing hashish with the intent to distribute, in violation of Article 134, Uniform Code of Military Justice [hereinafter referred to as UCMJ], 10 U.S.C. § 934 (1982).[1] Appellant was sentenced to a bad-conduct discharge, confinement for three years, forfeiture of all pay and allowances, and reduction to the grade of Private E-1. The convening authority approved the sentence.

At trial, appellant's sole defense to the charges was one of entrapment. He now contends that the military judge's findings on his entrapment defense mandate setting aside his conviction. The military judge found, *inter alia*, that there was no evidence that appellant was predisposed to commit the offenses of which he was convicted. Accordingly, appellant contends that, under the particular facts of this case and within the context of his defense, the military judge found that the government had failed to prove beyond a reasonable doubt that appellant was *not* entrapped, and thus his conviction must be overturned by this court. Since we agree and find that the government did indeed fail to prove that appellant was not entrapped—a failure that is reflected in the military judge's finding of no evidence of predisposition—we need not address the remaining issues raised by appellant.[2]

1. Appellant was acquitted of violating a lawful general regulation by having "drug abuse paraphernalia" in his possession. The military judge granted the defense motion for a finding of not guilty after both the government and the defense had rested on the merits.

2. One of the other two assigned errors concerned the absence at trial of the Criminal Investigation Command's confidential informer, Mr. Heiko Dorner. Following the military judge's determination that Mr. Dorner was a "relevant and necessary" defense witness on the issue of entrapment, Rule for Courts-Martial [hereinafter referred to as RCM] 703(b)(1), he ruled that Mr. Dorner was an unavailable witness within the definitions of unavailability prescribed in Military Rule of Evidence 804(a)(5) and (6). *See also* Article 49(d)(2), UCMJ, 10 U.S.C. § 849(d)(2). Based on the defense having interviewed Dorner and taken three sworn statements from him, the military judge determined these statements to be an adequate substitute for the missing witness' live testimony. The statements (Defense Exhibits A, B, and C) were considered as a stipulation of Mr. Dorner's expected testimony.

The defense argues here, as it did at trial, that, pursuant to RCM 703(b)(3), appellant should have been granted a continuance to permit additional efforts to locate Mr. Dorner and secure his presence at the court-martial, or the proceedings should have been abated by the military judge. Appellant contends that the judge's refusal to do either constituted prejudicial error. While we need not and will not decide this issue in light of our finding that the government failed to disprove that appellant was entrapped, we would make the following observation: Mr.

The relevant facts of this case are uncontroverted and relatively straightforward. A German national by the name of Heiko Dorner was employed at a U.S. Army installation in Germany. Apart from his employment, Dorner, a former member of the U.S. Army, assisted the Criminal Investigation Command (CID) as a confidential informer. He provided the CID with information about unlawful drug transactions involving American servicemembers.[3] Appellant was stationed in Germany and knew Dorner as a civilian employee of the military. Appellant was in dire need of money and approached Dorner about helping him get a job during nonduty hours. Aware of appellant's pressing financial problems, Dorner believed that appellant might be willing to deal in drugs. However, after initially discussing the subject with appellant, Dorner concluded that appellant would not agree to traffic in drugs unless Dorner "worked on him."

Dorner proceeded to meet with appellant on an average of four or five nights weekly for three consecutive weeks. During these meetings Dorner would tell appellant that he could not find a legitimate job for him and that a good way for him to make money was to "deal" hashish. Dorner's stipulated testimony reads, in part, as follows:

> I would continually tell PFC Meyers that I could not find a job for him such as a job with McDonalds [sic] or with my brother-in-law's moving company. I would at this point in each conversation tell Meyers that a good way for him to make money would be to deal hashish.

> *PFC Meyers would refuse to have anything to do with dealing drugs and repeatedly told me so on numerous occasions. During these conversations PFC Meyers would say to me, "This is not my thing." I would then reiterate how easy it would be for PFC Meyers to get hashish and what kind of money could be made from dealing hashish.*

(Emphasis added.)

In his meetings with appellant, Dorner also suggested that appellant get drugs from his (appellant's) girlfriend who Dorner knew was involved in drugs. Dorner continued to tell appellant that he could get drugs from his girlfriend, and "[a]fter three ... weeks of this continual prodding by [Dorner]" appellant began to break down. At this point Dorner intensified his efforts and "finally one evening ... got PFC Meyers drunk and while being prodded by [Dorner] to deal drugs, [and] while he was drunk, [Meyers] finally agreed to deal hashish." Dorner then told appellant that he should start by trying to obtain one pound of hashish. Appellant's agreement to distribute hashish and Dorner's advice on how to begin this illicit activity occurred on 24 May 1984. The offenses of which appellant was convicted occurred on 25 and 26 May 1984. Dorner described his work as a confidential informer on appellant's case as being the first time that he had acted in that capacity without substantial help from military law enforcement agents. Further, he was not briefed on the meaning and effect of entrapment by the CID until

Dorner obviously was a crucial witness concerning whether or not appellant had been entrapped. The government never interviewed Mr. Dorner before he left the trial situs. The defense not only had interviewed Mr. Dorner, but had taken three sworn statements from him. Thus, in Dorner's absence, the government opposed a further continuance (there already had been three) as being of no avail in securing the witness' presence at trial, and left itself with no alternative but to stipulate to Dorner's statements which, in the opinion of this court, were *prima facie* evidence of entrapment. Under such circumstances, there is a certain Pickwickian quality to the government opposing the de-

fense request for a further continuance to attempt to secure Mr. Dorner's presence at trial.

3. Mr. Dorner had assisted the CID as a confidential informer in 1978 and 1979. After serving with the U.S. Army for three years, Dorner again contacted the CID and offered to serve as a confidential informer in the Federal Republic of Germany. Subsequently, through the efforts of the CID agent to whom he later reported on appellant's drug activities, Dorner obtained a civilian job at a U.S. military installation in Germany. However, his stated reason for assisting the CID was because one of his best friends had died from a drug overdose.

some three weeks after appellant was apprehended for distributing hashish.

Appellant testified that he had smoked hashish while he was in high school and had continued smoking it after entering the Army. He always had purchased hashish for his own use but had never distributed it before meeting Dorner. He thought Dorner possibly could get him a second job so he could earn additional money. He had gotten a German girl pregnant and needed money to pay for an abortion. Appellant resisted Dorner's initial suggestions that he make money by selling drugs. Appellant had never sold drugs before; and, although he used drugs, appellant considered the sale of drugs to be "a lot more major than just smoking." [4] However, appellant's girlfriend became pregnant and his financial situation worsened. Finally, appellant agreed to distribute hashish even though he "didn't really want to get involved" in drug selling. Dorner persuaded him that dealing in drugs would be easy and that he, Dorner, would help appellant distribute the drugs. Appellant was drinking when he agreed to Dorner's suggestion, but followed through on it the next day when he was sober. He obtained 500 grams of hashish from a source to whom he was introduced by his girlfriend. Appellant then cut the hashish into small pieces and wrapped the pieces in aluminum foil in order to distribute the hashish for profit. He enlisted the aid of two other servicemembers to help him distribute the hashish, and believed he would make a profit of approximately $2,000.00. Appellant testified that Dorner had smoked hashish with him, but had never given him any hashish. Further, Dorner did not assist him in obtaining the 500 grams of hashish; Dorner did not participate in either cutting up the hashish or wrapping it for distribution; and Dorner was not involved in getting the two other servicemembers to agree to distribute the hashish. Admittedly, appellant made his own arrangements to become a drug trafficker and he did so to make money. He acted quickly after eventually succumbing to Dorner's proposed scheme. Once he had agreed on 24 May to distribute drugs for money, appellant obtained the drugs the next day and on the evening of 25 May told Dorner that he had the hashish in his wall locker. Dorner related this information to a CID agent and, on 26 May, a search of appellant's wall locker resulted in the seizure of approximately 442 grams of hashish. Subsequent searches of the other two servicemembers' rooms resulted in the seizure of the hashish that appellant had given them to distribute.

The military judge, in ruling that appellant was not entrapped by the government, announced the following findings:

> First of all, *I find no evidence to support predisposition on the part of this accused to commit the offenses of distribution or possession with intent to distribute.* However, I find that the accused entered into these activities for the purpose of realizing a profit. And I further find no conduct on the part of any government agent, including Heiko Dorner, which violates fundamental fairness or is shocking to the universal sense of justice in the outrageous manner indicated in the *Beltran* case [*United States v. Beltran,* 17 M.J. 617 (N.M.C.M.R. 1983), *pet. denied,* 18 M.J. 440 (C.M.A. 1984)].

(Emphasis added.) Thus, we may reasonably infer from these findings that, regardless of appellant's lack of predisposition to commit the charged offenses, the military judge ruled that appellant's admitted desire to make money foreclosed the successful advancement of an entrapment defense. In doing so, the judge relied upon language that first appeared in military decisional law in *United States v. Hebert,* 1 M.J. 84 (C.M.A.1975), *cited with approval in Beltran,* 17 M.J. 617; *see also United States v. Shults,* 7 M.J. 524, 525 (A.C.M.R.1979); *United States v. Young,* 2 M.J. 472, 477 (A.C.M.R.1975). The apparently dispositive

---

**4.** Appellant believed that when he smoked hashish, although it was unlawful, he was "just harming [himself]."

legal principle applied by the military judge, as drawn from *Hebert* and its progeny, is that an accused's "profit motive foreclosed the defense of entrapment absent evidence of conduct by the Government agents which violates 'fundamental fairness, shocking to the universal sense of justice.'" *United States v. Hebert*, 1 M.J. at 86 (citations omitted).[5] If this is the current state of military decisional law (that is, an accused cannot be entrapped if he agrees to engage in an unlawful practice to make money), certainly there is ample evidence in the trial record that appellant yielded to the agent's continuous importuning and agreed to traffic in drugs because he needed money.

We must first determine, however, whether the military has adopted a test which forecloses entrapment under the circumstances of this case. Such a test, if one in fact has been fashioned by the Court of Military Appeals, would appear to be unique to the military. It would be an objective test which, rather than examining the conduct of the police, would focus solely on the accused's expressed need for money. Using such an objective criterion, once an accused indicated by action or utterance, or it was otherwise established, that he wanted to realize a profit, the defense of entrapment would forever elude his grasp absent evidence of outrageous governmental conduct that violated the Due Process Clause of the Fifth Amendment of the Constitution. In other words, establishment of the so-called profit motive would establish the accused's predisposition to commit the charged offense as a

matter of law. We do not believe that the Court of Military Appeals has fashioned such a brightline rule to preclude consideration by the fact finder of an otherwise complete defense raised by the evidence at trial.

In *United States v. Vanzandt*, 14 M.J. 332 (C.M.A.1982), Chief Judge Everett provided not only a "learned elucidation" of the complexities accompanying the evolving law of entrapment, but guidance on certain rules governing entrapment's application in the military as well. The Chief Judge, writing for the majority, set forth three rules:

> First, the defense [of entrapment] is not raised unless the accused's commission of the alleged criminal acts is proven beyond reasonable doubt, and *there is evidence that the suggestion or inducement for the offense originated with a government agent.* Second, once the defense is raised, *the Government must prove that the accused was predisposed to commit the criminal activity* and needed only the opportunity to commit the crime. Third, with one limited exception [the due process defense], the issue must be resolved by the fact finder.

*United States v. Vanzandt*, 14 M.J. at 343 (footnotes omitted) (emphasis added).

Although there are conflicting views in federal decisional law concerning whether the viability of an entrapment defense is to be measured objectively or subjectively, the subjective test represents the majority view and, as the Chief Judge confirmed in *Vanzandt*, the military subscribes to the

---

5. In *Hebert*, the United States Court of Military Appeals [hereinafter referred to as Court of Military Appeals] appears to cite *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), as support for the principle that a profit motive forecloses an entrapment defense. United States v. Hebert, 1 M.J. at 86. However, the following language in *Russell* is authority only for what has come to be referred to as the "due process defense":

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to ob-

tain a conviction, *cf. Rochin v. California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), the instant case is distinctly not of that breed.... The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

*United States v. Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43 (citations omitted). Neither *Russell* nor any other (non-military) federal case disclosed by our research supports the proposition that a defendant's profit motive, in and of itself, prevents him from raising and possibly prevailing on a claim of entrapment.

majority view. Thus, rather than focusing on the type and degree of governmental conduct without considering an accused's predisposition, military courts employ a subjective balancing test.

In approaching the law of entrapment as it presently exists in the military, we recognize the following principles:

■ First, once an accused introduces some evidence raising the possibility that he was induced to commit a crime, the burden of going forward with the evidence shifts to the government which, to obtain a conviction, must prove the absence of entrapment beyond a reasonable doubt. *United States v. Vanzandt*, 14 M.J. at 343; *United States v. Mack*, 643 F.2d 1119, 1121–22 (5th Cir.1981); *United States v. Rodriguez*, 474 F.2d 587, 589 (5th Cir.1973).

■ Second, once the entrapment defense is raised, the government, to meet its burden of rebutting the defense, may introduce relevant evidence of an accused's actions before and after his commission of the offenses to show predisposition. *United States v. Vanzandt*, 14 M.J. at 343; *United States v. Black*, 8 M.J. 843 (A.C.M.R.), *pet. denied*, 9 M.J. 253 (C.M.A.1980); *United States v. Moschiano*, 695 F.2d 236, 244 (7th Cir.1982).

■ Third, "[t]he latitude given the Government in 'inducing' the criminal act is considerably greater in contraband cases (drugs, liquor)—which are essentially 'victim-less' crimes [6]—than would be permissible as to other crimes, where commission of the acts would bring injury to members of the public." *United States v. Vanzandt*, 14 M.J. at 344 (footnote omitted and footnote added).

■ Fourth, "[t]he initial entrapment, assuming it existed, [does] not immunize [an accused] from criminal liability for subsequent transactions that he readily and willingly undertook." *United States v. North*, 746 F.2d 627, 630 (9th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1773, 84

L.Ed.2d 832 (1985); *cited with approval in United States v. Bailey*, 21 M.J. 244, 247–48 (C.M.A.1986) (Cox, J., concurring).

■ Fifth, if the governmental conduct allegedly constituting entrapment violates that " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment," an accused's conviction cannot stand. *United States v. Russell*, 411 U.S. at 432, 93 S.Ct. at 1643; *see also United States v. Spivey*, 508 F.2d 146, 149 (10th Cir.) ("We recognize that, under *Russell*, a positive test for 'outrageous conduct' is, by itself, reason enough for the reversal of a conviction notwithstanding that the defendant was predisposed, and notwithstanding that a criminal otherwise goes free."), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

■ Sixth, by itself, "the circumstance that an accused has possessed and used a drug does not preclude his advancing an entrapment defense in a prosecution for its distribution. That defense will succeed if the factfinder determines that, even though the accused had previously possessed and used drugs, the idea of selling them was first planted in his mind by government agents." *United States v. Bailey*, 21 M.J. at 246 (footnote and citation omitted).

■ We believe the controlling element under military decisional law for subjectively measuring entrapment is predisposition. The Court of Military Appeals in *Hebert* decided that the accused's plea of guilty to wrongful distribution of marijuana was provident. The court rejected the argument that the plea was improvident because extenuation and mitigation testimony, together with a stipulation of fact, had reasonably raised the defense of entrapment. Focusing on the accused's "intent or predisposition," the court found that "the accused's responses during the providence inquiry [provided] ample evi-

---

6. Of course, we recognize that not all drug offenses are "victim-less." For example, the offense of wrongful distribution certainly victim-

izes a buyer who dies from ingesting his purchase or eventually becomes a drug addict.

dence of a *criminal predisposition."* *United States v. Hebert,* 1 M.J. at 85 (emphasis added). One of the accused's responses was that he intended to profit from the marijuana transaction ("[o]nly enough to make it worth my while."), and presumably it was this response that, at least in part, led to the court's observation that "[s]uch a profit motive foreclosed the defense of entrapment." *Id.* at 86. However, since in *Hebert* the Court of Military Appeals *found "ample evidence" that the accused was predisposed to commit the offense,* we interpret the decision as applying the subjective theory of entrapment to a particular set of facts.[7] Accordingly, it is our view that the fashioning of a more far-reaching rule from the holding in *Hebert*—a rule that prescribes an entrapment standard that is both separate and apart from the subjective theory—was never intended by the Court of Military Appeals. We do not believe that *Hebert* is precedent for the rule that an accused's profit motive, once shown, automatically negates an entrapment defense. *See United States v. Watson,* 489 F.2d 504 (3d Cir.1973) (defendant's admitted monetary motive for eventually agreeing to sell narcotics does not, standing alone, establish predisposition, and therefore an absence of entrapment as a matter of law); *United States v. White,* 390 F.2d 405 (6th Cir.1968) (factual question of entrapment exists where defendants testified that their initial reluctance to commit crime was overcome by government agent's insistence, as well as their pressing financial needs); *United States v. Klosterman,* 248 F.2d 191 (3d Cir.1957) (defendant entrapped as a matter of law even though no motive given for his criminal activity other than desire for monetary gain).[8] Rather, we are persuaded that, consistent with the subjective test that has been adopted by the military, an accused's need for money is a relevant factor to be considered when determining the element of predisposition.[9] Such a factor may or may

---

7. In *United States v. Vanzandt,* 14 M.J. at 343, the Court of Military Appeals cites *Hebert* to support the relatively limited proposition that any possibility of entrapment is excluded when an accused agrees to the sale of drugs "immediately upon being asked," and accepts money for the drug without hesitation. In the instant case, appellant initially resisted and continued to resist the government informer's persistent attempts to persuade him to distribute drugs. Moreover, the facts establish that the informer repeatedly exploited appellant's need for money when inducing appellant to commit drug trafficking. Under these circumstances, appellant should *not* be foreclosed from asserting entrapment. Even assuming *arguendo* that the holding of *Hebert* is that an accused's profit motive forecloses an entrapment defense, appellant's case, on its facts, is readily distinguishable from *Hebert.*

8. *But see United States v. Diaz-Padilla,* 17 M.J. 752 (A.C.M.R.), *pet. denied,* 18 M.J. 285 (C.M.A. 1984); *United States v. Beltran,* 17 M.J. 617 (N.M.C.M.R.1983), *pet. denied,* 18 M.J. 440 (C.M. A.1984); *United States v. Dejong,* 13 M.J. 721 (N.M.C.M.R.1982); *United States v. Shults,* 7 M.J. 524 (A.C.M.R.1979); *United States v. Young,* 2 M.J. 472 (A.C.M.R.1975).

9. Department of the Army Pamphlet 27–9, Military Judges' Benchbook (Cl, 15 Feb. 1985), para. 5–6, contains a standard instruction for entrapment which incorporates the subjective test. It reads in pertinent part as follows:

The defense of entrapment exists if the original suggestion and initiative to commit the offense(s) originated with the government, not the accused, and the accused was not predisposed or inclined to commit the offense(s).... Thus, you must balance the accused's resistance to temptation against the amount of government inducement. The focus is on the accused's latent predisposition, if any, to commit the offense(s) which is triggered by the government inducement.

The note following the standard instruction states: "Relevant factors on the issue of entrapment may include the circumstances surrounding the alleged transaction (e.g., the nature and number of enticements by government agents to the accused; the accused's apparent willingness or reluctance to engage in the activity involved) as well as evidence of other acts of misconduct similar to those charged to establish predisposition." Nowhere in the paragraph is there a statement to the effect that a profit motive on the part of the accused will foreclose the defense.

Before its revision, the instruction incorporated not only the subjective test for entrapment, but the objective test as well. *See United States v. Garrison,* 18 M.J. 581 (A.C.M.R.1983) (since the military had adopted a *subjective test,* it was reversible error for the military judge to give an instruction including the *objective test* because it embraced the government's principal response that the objective test had been met and thus entrapment disproved), *pet. denied,* 19 M.J. 143 (C.M.A.1984).

not show that an accused was predisposed to commit a criminal act, depending on its significance relative to other evidence in the case.

■ Those factors that we would identify as particularly significant in determining whether or not an accused was predisposed to commit an offense include: (1) whether the government made the initial suggestion of criminal activity; (2) whether the accused engaged in the activity for profit; (3) whether the accused was reluctant to engage in the activity and the degree of reluctance shown; and (4) the nature of and the circumstances surrounding the government's inducement, if any. *See United States v. So,* 755 F.2d 1350, 1354 (9th Cir.1985). We decline to treat any one factor as on its face being more important than any other. The weight to be given each factor, under the totality of the circumstances, in resolving the issue of predisposition is best left to the fact finder in each individual case.

■ In the case at bar, the evidence of record shows that the government's agent, Mr. Dorner, not only initially suggested to appellant that he distribute drugs but persisted in his attempts to gain appellant's agreement for approximately three weeks. And while there is no question that appellant needed money, thus bearing directly on the factor of profit motive, his repeated requests were that Mr. Dorner find him a *lawful* means of making the needed money, specifically, a legitimate job. To overcome appellant's unequivocal and frequently expressed reluctance to deal in drugs, Dorner deceitfully pretended to search for

a legitimate job for appellant, told appellant that he was unable to find him legitimate work,[10] continuously counseled appellant that dealing in drugs was an easy way to make the needed money, informed appellant that appellant's girlfriend could put him in contact with a drug supplier, and "prodded" appellant "to deal drugs." Finally, after three weeks of "continual prodding," appellant "began to break down." Dorner then administered the coup de grace—he got appellant drunk. It was only then that appellant "finally agreed" to distribute hashish. Within a scant two days of acceding to Dorner's seemingly unending efforts, appellant had obtained a large amount of hashish,[11] had prepared it for distribution, had given some to two other servicemembers to distribute, had contacted Dorner to report the status of the criminal activity that Dorner had suggested, and, based on information provided by Dorner to the CID, had been apprehended for his illegal activities. Consequently, the uncontroverted evidence portrays an extremely reluctant individual as opposed to a readily complaisant one. Even granting the government the increased latitude that it is afforded with respect to inducement in contraband cases, appellant not only rejected numerous attempts by the government's agent to persuade him to distribute drugs, but exhibited a marked resistance to, much less enthusiasm or relish for, the agent's continuous inducements.[12]

We are not convinced beyond a reasonable doubt from our examination of the trial record that appellant, despite his need for money, would have agreed to distribute

10. We may reasonably infer from the evidence that Mr. Dorner was making no effort whatsoever to find lawful employment for appellant since his sole purpose for meeting with appellant was to persuade him to traffic in hashish.

11. Appellant, in obtaining the hashish, acted on Dorner's suggestion that appellant's girlfriend would be able to arrange a meeting with a drug supplier.

12. At the very core of entrapment is the premise that the government cannot, under our system of laws, "[play] on the weaknesses of an innocent party and [beguile] him into committing

crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this [sic]." *Sherman v. United States,* 356 U.S. 369, 376, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958) (footnote omitted). "At the trial the factual issue was whether the informer had convinced an otherwise unwilling person to commit a criminal act or whether [appellant] was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade." *Id.* at 371, 78 S.Ct. at 820.

hashish had it not been for the fraudulent representations and persistent solicitations of the government's informer, Mr. Dorner.[13] Furthermore, while we agree that there exists sufficient evidence of record to support the military judge's finding that there was no showing that appellant was predisposed to commit these crimes, we believe that the judge then proceeded to misinterpret military decisional law by rejecting the entrapment defense on the basis that appellant's admitted profit motive foreclosed that defense as a matter of law. We believe that an accused's pressing financial needs and his desire to make money are very significant factors which impact upon the element of predisposition; however, they are not factors which we in the law, acting as technocrats rather than judges, will apply unquestioningly to foreclose entrapment regardless of the attendant circumstances or, when applicable, the concept of fundamental fairness. *Cf. Hampton v. United States*, 425 U.S. 484, 494 n. 5, 96 S.Ct. 1646, 1652 n. 5, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) ("A fair system of justice normally should eschew unbending rules that foreclose, in their application, all judicial discretion."). We further find that the government has failed to carry its burden of proving beyond a reasonable doubt that appellant was not entrapped by its informer's actions. Accordingly, even viewing the evidence in the light most favorable to the government, we are persuaded that the government's failure is a failure of proof.[14]

In reaching this result we have taken into most careful consideration that appellant (although not predisposed to sell drugs according to the military judge's finding of fact) was an admitted habitual possessor and user of hashish before he agreed to distribute it, that he associated with a girlfriend who was suspected by the informer of having drug contacts, and that he also acted personally, quickly, and skillfully in his preparations to set the agreed upon criminal enterprise into motion. However, we specifically find that there was no attenuation between the initial entrapment and the subsequent criminal activity by appellant. *See United States v. Bailey*, 21 M.J. at 247–48 (Cox, J., concurring) ("once entrapped does not necessarily mean always entrapped" and "contentions that subsequent misconduct was the product of the original inducement—and not some later inspiration—are also generally matters to be resolved by the fact finder").

Accordingly, the findings of guilty and the sentence are set aside. The charges are dismissed.[15]

Senior Judge RABY and Judge ROBBLEE concur.

---

**13.** The government maintained during oral argument that appellant's financial condition (his need for money) was the inducement that compelled him to distribute drugs rather than Mr. Dorner's constant importunings. We are not persuaded by the government's argument. *See Sagansky v. United States*, 358 F.2d 195, 202 (1st Cir.) (inducement defined), *cert. denied*, 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966).

**14.** Implicit in our analysis has been an application of the rules governing entrapment identified in *United States v. Vanzandt*, 14 M.J. at 343. We believe that the defense of entrapment was reasonably raised by the evidence, and that the government failed to carry its burden of prov-

ing appellant was not entrapped. Consequently, we have not found it necessary to consider the government agent's reprehensible conduct against a due process standard. *See United States v. Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43.

**15.** The Fifth Amendment guarantee against double jeopardy embodies collateral estoppel as a constitutional requirement. "Collateral estoppel ... means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970).